406 S.E.2d 700

Joe D. HELMICK and Tammy Helmick, Plaintiffs Below, Appellees,

v.

POTOMAC EDISON COMPANY, a Maryland Corporation, Defendant Below,

Carl Belt, Inc., a Maryland Corporation, Hester Industries, a Corporation, Defendants Below, Appellees,

Potomac Edison Company, a Maryland Corporation, Defendant Below, Appellant.

No. 19772.

Supreme Court of Appeals of West Virginia.

Submitted May 14, 1991.

Decided June 27, 1991.

Frank E. Simmerman, Jr., Allen, Johnson & Simmerman, Clarksburg, W.Va., and Donald E. Cookman, Cookman & Moreland, Romney, W.Va., for Joe D. Helmick and Tammy Helmick.

Clarence E. Martin, James J. Matzureff, Martin & Seibert, Martinsburg, W.Va., for Potomac Edison Co.

Charles W. Smith, Keyser, W.Va., for Carl Belt, Inc.

Joseph A. Wallace, Paul J. Harris, Wallace, Ross and Harris, Elkins, W.Va., for Hester Industries.

NEELY, Justice:

Joe D. Helmick and Tammy Helmick brought an action against Potomac Edison Company in the Circuit Court of Hardy County for injuries that Mr. Helmick received in moving a guy wire attached to a Potomac Edison utility pole. After removal to the United States District Court for the Northern District of West Virginia, the Helmicks added Hester Industries, Inc., on whose property the injury had occurred, as a defendant, destroying diversity jurisdiction, and the case was returned to the Circuit Court of Hardy County. Potomac Edison cross-claimed against Carl Belt, Inc., Mr. Helmick's employer, for its negligence. Potomac Edison now appeals the verdict against it for $515,621.86 and the trial court's dismissal of its claims against Hester and Carl Belt. We affirm.

On 24 October 1986, Joe D. Helmick burned his left forearm and the soles of both of his feet when he attempted to move a guy wire connected to a utility pole that was supporting power lines operated by Potomac Edison. Ultimately, Mr. Helmick's left arm had to be amputated at the elbow. Skin grafts to his feet have allowed Mr. Helmick to walk again. Although Mr. Helmick returned to work with Carl Belt, he is no longer able to do the heavy manual labor for which he was originally hired.

At the time of the accident, Carl Belt was an independent contractor employed by Hester Industries, Inc. to do construction at Hester's Moorefield plant in Hardy County. During construction, the guy wire attached to the utility pole had to be moved several times to allow construction. Carl Belt asked Potomac Edison to send someone to remove the guy wire temporarily; Potomac Edison refused for the alleged reason that to do so would relax tension on the pole. The jury, however, could have reasonably inferred that the true reason for defendant's uncooperative response was an unwillingness to undertake additional work. Following Potomac Edison's refusal, Carl Belt's employees successfully moved the wire on several occasions.

When the accident happened, Mr. Helmick (along with Allan Street and Dale White, two other employees of Carl Belt) was trying to move the guy wire by means of a come-along[1] that was attached to it. Carl Belt's employees had attached the come-along to the guy wire approximately one to two months before the accident for use in moving the wire. The come-along was left attached for this one to two month period in full view, and, in fact, Potomac Edison's employees had seen Carl Belt's employees use the come-along to move the guy wire.

The utility pole was erected pursuant to a 1982 agreement between Potomac Edison and Hester for Potomac Edison to provide electricity to Hester.[2] Potomac Edison points out that it moved the pole onto Hester's property without an explicit new grant of right-of-way for the pole, but there was also no explicit agreement between Potomac and Hester that ownership of the pole would be transferred. When

---

**1.** A come-along is a mechanical device used to grip two objects and pull them together. It consists of two jaws attached to a ring so that the jaws are closed by pulling on the ring. *Webster's Third New International Dictionary,* 265 (G. & C. Merriam Co. 1970).

**2.** The agreement was a standard form contract supplied by Potomac Edison with two additional typewritten paragraphs. The two paragraphs at issue in the court below were Paragraph 7, Potomac Edison's standard indemnification agreement and, Paragraph 15, one of the typewritten paragraphs pertaining to Hester's duty to protect certain property (specifically a transformer) leased from Potomac Edison.

Potomac moved the pole they did not remove their ownership tag from the pole, but instead left it there indicating Potomac Edison's continued ownership of the pole.

Before trial, Mr. Helmick received an award of $53,760 from West Virginia Workers' Compensation. Shortly before trial, the plaintiffs dismissed their *Mandolidis*[3] claims against Carl Belt, although Potomac Edison continued to pursue its *Mandolidis* cross-claim against Carl Belt.

After the close of Potomac Edison's case in chief, the trial court directed a verdict against Potomac Edison on its *Mandolidis* cross-claim against Carl Belt. The trial court also granted Hester's motion for directed verdict against Potomac Edison on its claim for indemnification under paragraph 7 of the 1982 agreement.

The court sent to the jury the question of Potomac Edison's liability to the Helmicks and the question of Hester's liability to Potomac Edison under paragraph 15 of the 1982 agreement. The jury returned a verdict of $473,232.84 in favor of Mr. Helmick and a verdict of $25,000.00 in favor of Ms. Helmick. Prejudgment interest brought the total to $515,621.86. The jury also found that Potomac was 40% liable, that Carl Belt was 60% liable, and that Mr. Helmick was not liable. On the issue of paragraph 15, the jury found Hester not liable.

The judge then ordered that Potomac Edison pay the full amount of the verdict.

## I.

■ Potomac Edison now appeals to this Court with nine assignments of error. Hester cross-assigns three errors. Much of Potomac Edison's argument asks us to re-plow the ground that we covered in the recent case of *Miller v. Monongahela Power Company*, 184 W.Va. 663, 403 S.E.2d 406 (1991). In *Miller*, we held that:

In a consistent line of cases stretching back over nearly a century, we have held that electricity is an inherently dangerous instrumentality and that its management requires a peculiarly high level of care. In this regard, although we have never gone so far as to make electric companies insurers, we have come reasonably close by making it clear that any deviation from the highest possible standard of care is sufficient to impose liability.

*Miller*, 184 W.Va. at 668, 403 S.E.2d at 411.

■ In *Miller* we also noted:

A company maintaining an electric line, over which a current of high and dangerous voltage passes, in a place to which it knows or should anticipate others lawfully may resort for any reason, such as business, pleasure or curiosity, and in such manner as exposes them to danger of contact with it by accident or inadvertence, is bound to take precautions for their safety by insulation of the wire or other adequate means. Syllabus Point 2, *Love v. Virginian Power Co.*, 86 W.Va. 393 [103 S.E. 352].

*Miller*, 184 W.Va. at 668, 403 S.E.2d at 411.

Today, we reaffirm these holdings. The jury could reasonably have found that Potomac Edison acted negligently when it did not remove the guy wire *or* move the utility pole at Carl Belt's request, and that Potomac was negligent when it put up this terminal utility pole with the guy wire and the electrical wires on the same side.[4]

## II.

■ Potomac Edison's first three assignments of error involve Carl Belt and its immunity from suit under West Virginia

---

**3.** *Mandolidis* claims take their name from this court's decision in *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 246 S.E.2d 907 (1978). Ordinarily *Mandolidis* claims are brought by injured employees who seek to recover from their employers beyond the coverage of the Workers' Compensation system. To make such a recovery, the employee must prove that his employer acted with deliberate intention in exposing him to the hazard. In the present case, Potomac Edison seeks to recover *Mandolidis* damages as a cross-claim.

**4.** As the testimony at trial showed, the standard for terminal utility poles (even those in Potomac Edison's own materials) is that the guy wire and the electrical wires be placed on opposite sides of the utility pole.

Workers' Compensation. Although Mr. Helmick dropped his *Mandolidis* claim against Carl Belt before trial, Potomac Edison continued to pursue its *Mandolidis* cross-claim at trial. Potomac Edison claims that the trial court should not have directed a verdict against it on this claim.

■ The West Virginia Workers' Compensation Act provides compensation to employees injured at their work place while also protecting employers from civil litigation by injured employees. There is an exception to this immunity, however, when the employee's injury is the result of the employer's "deliberate intention" to cause that injury. The legislature has codified the "deliberate intention" standard in *W. Va. Code*, 23–4–2(c)(2) [1983], which provides in pertinent part:

The immunity from suit provided under this section and under § 6–A [§ 23–2–68], article II of this chapter, may be lost only if the employer or person against whom liability is asserted acted with "deliberate intention." This requirement may be satisfied only if:

(i) It is proved that such employer or person against whom liability is asserted acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee. This standard requires a showing of an actual, specific intent and may not be satisfied by allegation or proof of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct; or

(ii) The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:

(A) That a specific unsafe working condition existed in the work place which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such unspecific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with the statute, rule, regulation or standard generally requiring safe work places, equipment or working conditions;

(D) That notwithstanding the existence of facts set forth in sub-paragraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

In the case before us, Potomac Edison asserts that its claim under sub-section (ii) should have been allowed to go to the jury.

The "deliberate intention" exception to the Workers' Compensation system is meant to deter the malicious employer, not to punish the stupid one. Carl Belt was indeed negligent in allowing the events that led up to this accident to occur, but it was not malicious.

The evidence showed that Carl Belt did not realize the danger, and that, in fact, some of Carl Belt's supervisory personnel took part in the moving of the guy wire on several occasions. Potomac Edison offered no evidence of the violation of a safety statute or of a commonly accepted practice within the industry and certainly no evidence that Carl Belt intentionally exposed Mr. Helmick to this harm. Therefore, Potomac Edison did not meet at least three of

the elements required by *W.Va.Code*, 23–4–2 [1983], to show "deliberate intention."

*W.Va.Code* 23–4–2(c)(2)(iii)(B) [1983] specifically provides:

> [for] prompt judicial resolution of issues of immunity from litigation under this chapter ... The court shall dismiss the action upon a timely motion for directed verdict ... if after considering all the evidence and every inference legitimately and reasonably raised thereby most favorably to the plaintiff, the court shall determine that there is not sufficient evidence to find each and every one of the facts required to be proven ...

Consistent with the legislature's command of prompt judicial resolution when appropriate, the trial court directed a verdict against Potomac Edison on its *Mandolidis* cross-claim, and we find no error.[5]

■ Potomac Edison next claims that if it is deprived of its right to contribution and indemnity under the West Virginia Workers' Compensation Act, then the Act violates the due process clause of the *Constitution of the United States* and *W.Va. Const.*, art. III, § 17, which insures access to the courts. This argument is squarely addressed in our recent decision of Miller, *supra.* As we stated in syllabus point 5 of *Miller:*

> The combination of: (1) West Virginia's system of comparative negligence; (2) West Virginia's rules on joint and several liability; and, (3) West Virginia's statutory workers' compensation immunity does not violate federal due process and equal protection principles.

Although Potomac Edison presents a good argument from a strictly logical point of view, its argument would require us to overturn over one hundred years of American tort law. Again,

> [t]herefore, notwithstanding the novelty, ingenuity and even logic of [Potomac Edison's] argument, we decline to rewrite

the entire tort law of West Virginia in one fell swoop based on supposed federal principles without explicit federal direction.

*Miller,* 184 W.Va. at 671, 403 S.E.2d at 414.

■ Potomac Edison next offers an "equitable" solution that would allow a set-off from its claim by the lesser of Workers' Compensation benefits paid to Mr. Helmick or the percentage of negligence assigned to Carl Belt. Such a rule in this case would allow Potomac Edison to set off $53,760. Potomac Edison admits there is no West Virginia precedent for such an "equitable" solution, and we decline to develop such a new rule today.

### III.

■ On appeal Potomac Edison bases its claim against Hester on paragraph 7 of the 1982 agreement which provides:

> That the customer [Hester] agrees to at all times indemnify or save harmless the company [Potomac Edison] from and against all claims, demands, suits, actions and judgments and from and against all costs, expenses, pecuniary or other loss that may arise out of any damage, injury or loss of or to person, life and (or) property caused by any act or omission of the customer [Hester], its agents, servants and employees, and particularly caused by improper installation or defective equipment and (or) the operation of any equipment; but the customer [Hester] will not be responsible for or on account of, nor will it indemnify or save harmless the company [Potomac Edison] from and against, any such claim, demand, suit, action, judgment, cost, expense or loss that may arise out of any such damage, injury or loss caused by the sole negligence of the company [Potomac Edison], its agents, servants and employees....

■ Paragraph 7 is part of Potomac Edison's standard contract that it requires of

---

5. The case at hand is clearly different from this court's recent decision in *Mayles v. Shoney's, Inc.,* 185 W.Va. 88, 405 S.E.2d 15 (1990), which appellant cites to us. In *Mayles* the plaintiff was made to carry a hot bucket of grease out of the restaurant and down a steep grassy slope to a disposal area. The manager knew that such conditions existed and consciously appreciated that such conditions were dangerous, but did not act to change the conditions.

commercial customers. An adhesion contract is generally defined as one "drafted unilaterally by a business enterprise and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere." *Jones v. Dressel*, 623 P.2d 370, 374 (Colo.1981); *see also Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129 (4th Cir.1967); *Ponder v. Blue Cross of Southern California*, 193 Cal.Rptr. 632, 145 Cal.App.3d 709 (1983); *Cushman v. Frankel*, 111 Mich.App. 604, 314 N.W.2d 705 (1981); *Zuckerberg v. Blue Cross and Blue Shield of Greater New York*, 464 N.Y.S.2d 678, 119 Misc.2d 834 (1983).

In monopoly situations, the buyer is not able to negotiate contract terms freely, as it would be able to do in ordinary business situations. The 1982 agreement that Potomac Edison required Hester to sign in order to obtain electricity is a contract of adhesion.

■ We have previously addressed the question of adhesion contracts that require arbitration. While holding such contracts ordinarily enforceable, we found an exception where a gross disparity in bargaining power resulted solely from the monopolistic position of one of the parties. *Board of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977).

■ The Supreme Court of Virginia has addressed the issue in this case more directly, finding:

Where a *public duty* is involved, a public service company cannot relieve itself, either directly or indirectly, from liability to one whom the duty is owed.

*Richardson–Wayland Electrical Corp. v. Virginia Elec. & Power Co.*, 219 Va. 198, 247 S.E.2d 465, 467 (1978) (emphasis added).

We find the reasoning of the Virginia Supreme Court persuasive, and today adopt a similar rule. Contracts of adhesion by which monopolies require indemnification for incidents in which the monopoly is at fault are void as against public policy.

## IV.

■ Potomac Edison's fifth, sixth and eighth assignments of error involve evidence. The circuit court did not allow John St. Clair to testify as an expert witness on behalf of Potomac Edison. As Potomac Edison notes in its brief:

The other parties objected because Mr. St. Clair was disclosed as a witness after a discovery cutoff deadline of July 3, 1989. However, two other witnesses, specifically William E. Johnson, an economist, and Stephen Townsend, a psychologist were also noticed after the discovery cutoff date and the other parties made no objection to their testimony.

Potomac Edison brief at 42.

What Potomac Edison failed to note in its brief was that Mr. Johnson and Mr. Townsend were disclosed as expert witnesses on July 10, 1989, one week before the beginning of the trial. Mr. St. Clair's appearance, on the other hand, was noticed only by fax to opposing counsels' offices on the Sunday before the opening of trial on Monday morning.

■ We stated in *Hulmes v. Catterson*, 182 W.Va. 439, 388 S.E.2d 313 (1989), quoting from Syllabus Point 3 of *Michael v. Henry*, 177 W.Va. 494, 354 S.E.2d 590 (1987):

Under *W.Va.R.Civ.P.* 26(b)(4)(A)(i), "a party is required to disclose to another party the identity of persons whom that party intends to call as expert witnesses at trial only when that party has determined *within a reasonable time before trial* who his expert witnesses will be" (emphasis added).[6]

As a matter of law, notice of an expert witness by fax to a law office that will in

**6.** Potomac Edison refers us, instead, to a footnote in that same opinion where we quoted from the Advisory Committee note to the *Fed.R. Civ.P.* which states: "Discovery is limited to trial witnesses, and may be obtained only at a time when the parties know who their expert witnesses will be." Because Potomac Edison is so careful in reading footnotes, we note here for it that we generally consider the points that we put in the text to be more important than those we relegate to footnotes.

all likelihood be empty,[7] on a Sunday less than twenty-four hours before the trial is to begin on Monday morning is not made *within a reasonable time before trial.*

 Potomac Edison also assigns error to the refusal of the trial court to strike the testimony of Dr. Clarence E. Jones, plaintiffs' expert. Rule 703 of the *W.Va.R. Evid.* [1985] provides as follows:

> The facts or data in the particular case on which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in their field in forming opinions or inferences upon the subjects, the facts or data need not be admissible evidence.

Potomac claims that Dr. Jones' testimony was inadmissible because his testimony referred to the 1977 National Electrical Safety Code instead of the 1984 National Electrical Safety Code, and because he relied upon one of Potomac Edison's Transmission and Distribution manuals that came into effect after the accident occurred. Based on these data, and his other expertise, Dr. Jones testified essentially that Potomac Edison was negligent for not installing an insulator on the guy wire and for installing the guy wire on the same side of the utility pole as its high voltage equipment. After his testimony, counsel for Potomac Edison had ample opportunity to cross-examine Dr. Jones on his opinion and on the basis for his opinion. The jury was then able to consider Dr. Jones' testimony for what it was worth.

 The admissability of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong. The trial court's refusal to strike Dr. Jones' testimony was within his sound discretion.

 Potomac Edison's eighth assignment of error is that the trial court should not have admitted photographs of Mr. Helmick's injuries because the photographs were gruesome and because the photographs were of areas in which Mr. Helmick admitted that he experienced no pain. We find this claim incredible. Although Mr. Helmick may have suffered no pain in the regions photographed, the photographs offered other evidence. They could have shown the extent of cosmetic damage to Mr. Helmick, and they could have demonstrated the extent of his injury and the degree of his disability.

 As we noted in Syllabus Point 6 of *Miller, supra:*

> A trial court is afforded wide discretion in determining the admissability of photographic evidence.

Admission of this photographic evidence was clearly within the sound discretion of the trial court.

## V.

 Potomac Edison's seventh assignment of error is that the trial court erred in failing to reduce the damages awarded to Mr. Helmick because of Mr. Helmick's failure to mitigate damages. Before the accident, Mr. Helmick was a strong, able-bodied laborer with a grade school education and an IQ in the low 80's. Now Mr. Helmick has a grade school education, an IQ in the low 80's, but has only one arm and no longer can do heavy manual labor. Yet Potomac Edison claims that Mr. Helmick could have obtained other employment after he was laid off by Carl Belt but that he did not attempt to do so. Perhaps Mr. Helmick should have looked for work as a door stop in Southern California? We think not.

 Determining damages is the job of the jury and, as we held in Syllabus Point 6 of *Roberts v. Stevens Clinic Hosp.,* 176 W.Va. 492, 345 S.E.2d 791 (1986):

> Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption.

---

7. By happenstance, one of the opposing lawyers was in his office on this particular day.

Before the accident, Mr. Helmick performed manual labor such as digging ditches. Unfortunate as the circumstances are, there is not a great need in West Virginia for one-armed ditch diggers. Potomac Edison was free to offer evidence of Mr. Helmick's failure to mitigate his damages and was free to catalogue at length all of the high paying jobs available to him in the Greater Hardy County Metropolitan area. Perhaps if Potomac Edison had offered such evidence or evidence that it had offered Mr. Helmick a job but that he had refused, the jury would have found the damages to be lower. As the evidence was, the jury was entitled to find that Mr. Helmick was completely disabled and *unable* to find other work.

### VI.

 Potomac Edison's final assignment of error pertains to supposed irregularities in the makeup of the jury. Potomac Edison tendered an affidavit of a private investigator who alleged irregularities with the jury. Even if we assume that these allegations are true, we find no grounds for a new trial. First, Potomac Edison alleges that because two of the jurors were married, the jury was prejudiced against Potomac Edison. We find no merit in this claim.

Second, Potomac Edison claims that because one of the juror's spouses had been killed in an industrial accident, the jury was biased against Potomac Edison. Potomac Edison was allowed to request inquiry into such matters on voir dire and did not do so. It is not the province of this Court to do for appellants on appeal what their lawyers did not do on voir dire. We hold, therefore, that the makeup of the jury was not prejudicial to appellant, Potomac Edison.

### VII.

Appellee Hester cross-assigns three errors, two of which are no longer relevant.

Hester's third claim is that the trial court erred in not granting its attorneys' fees and court costs because Potomac Edison erroneously represented that Hester owned the utility pole involved in the accident. As we noted in Syllabus Points 2 and 3 of *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986):

As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement. [But]

There is authority in equity to award to the prevailing litigant his or her attorney's fees as "costs," without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons.

The evidence shows that Potomac Edison did not act in bad faith, vexatiously, wantonly, or for oppressive reasons. Indeed, our opinion demonstrates that Potomac Edison had one claim against Hester that was worthy of review by this court.

### VIII.

Therefore, for the reasons set forth above, the judgment of the Circuit Court of Hardy County is affirmed.

Affirmed.